JAMS ARBITRATION NO. 1220061506

**LAND GORILLA INC.**

    Claimant

and

**SI WELL, INC. dba CAPITAL MORTGAGE SERVICES OF TEXAS**

    Respondent

---

## AWARD

**Counsel:**

    Linda Somers Smith
    Adamski Moroski Madden Cumberland & Green LLP
    Post Office Box 3835
    San Luis Obispo, California  93403-3835
    805-543-0990     805-543-0980(fax)
    lss@ammcglaw.com
    Counsel for Claimant

    Charles Nunley
    Malcolm Cisneros a Law Corporation
    2112 Business Center Drive, Second Floor
    Irvine, California 92612
    949-252-9400     949-252-1032
    Charlie@mclaw.org
    Counsel for Respondent

**Arbitrator:**

    Hon. Melinda A. Johnson, Ret.
    JAMS
    401 "B" Street, Suite 2100
    San Diego, California 92101
    619-237-0801     619-236-9032 (fax)
    mjohnson@jamsadr.com

**Place of Arbitration:**

Conducted by Zoom.  All counsel and the Arbitrator were in California.

**Date of Award:**

September 2, 2021

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with Section 10.3 of the Master Services Agreement dated September 27, 2017, and having examined the submissions, proof and allegations, now finds, concludes and issues this Award as follows:

I.   **INTRODUCTION AND PROCEDURAL STATEMENT**

Claimant ("LG") filed its claim in arbitration on February 6, 2019.  Claimant sought payment of contractual fees due under the Master Services Agreement ("Agreement"), interest on that amount, and an award of attorney's fees and costs as the prevailing party, per paragraph 10.12 of the Agreement.  Claimant alleged a breach of contract, and breach of the covenant of good faith and fair dealing.

No answer was filed. Therefore, the Arbitrator proceeded as if a general denial had been made and no affirmative defenses were raised.[1]

The Arbitration was conducted on February 2 and 9, 2021, by Zoom. Linda Somers Smith appeared with Sean Faries ("Faries") as CEO of LG.  Charles Nunley appeared with Royce Lewis ("Lewis") as CEO of CMS.  The matter was not reported.

Land Gorilla submitted its opening post-hearing brief on February 17, 2021. In that brief, Claimant sought a separate and additional award of sanctions for failing to comply with the arbitration process and discovery requirements.

Respondent submitted its post-hearing brief on February 24, 2021.

LG filed its reply brief on February 26, 2021.

An Interim Award in Favor of LG was issued on April 19, 2021.

Claimant's request for and declaration in support of attorney's fees and costs was filed on May 3, 2021.  Respondent's objections thereto were filed on July 12, 2021.  Claimant filed its reply on July 19, 2021.

---

[1] See JAMS Comprehensive Rule 9

## II. FACTS

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award. To the extent this recitation differs from any party's position, that is the result of determinations as to credibility and relevance, and the weighing of the evidence, both oral and written.

Land Gorilla is a construction loan management company, which offers an array of software and services, from which a client may choose. CMS sells and services mortgage loans and is based in Lubbock, Texas.

In July, 2017, Lewis as CEO of CMS, hired William Berthelette ("Berthelette"), as a W-2 employee, to be National Director of Retail Sales. Berthelette had been at Silvergate Bank, and had done business and was friendly with Shannon Faries, an LG executive. He had also known Lewis since 2008, and had worked with him in prior years. Berthelette testified Lewis solicited him to work on construction and renovation loans, a new area for CMS. Lewis testified Berthelette approached him, and was hired to "bring in loans from other lenders." Lewis testified he had not considered construction loans until Berthelette brought him a "pilot" program LG had created to "manage construction draws." There was no other evidence that LG was offering some sort of pilot program. All, including Berthelette, agreed that Berthelette was very knowledgeable and had a good reputation in this area - and that he was in serious financial difficulty.

Expanding to nationwide lending, which was contemplated, would be complex to administer and expensive to staff, so outside vendors were an alternative to be considered. Berthelette knew, through Shannon Faires, that LG was just such an outside vendor and recommended LG's services to Lewis. Lewis considered two other vendors, at least one of whom he had used before, but opined that LG was better suited to his plans to work nationally.

The contract was negotiated over a period of more than two months. Lewis was often directly involved, although Berthelette did all negotiating over price on CMS' behalf. Among other modifications to LG's standard contract was a reduction in the initial software set-up fee, and an agreement to allow that fee and the Consumer Lending Product Development ("Scope of Work") fee, to be paid in installments. Lewis directed Berthelette to get the best deal he could and Berthelette made a strong case for discounts to LG.

CMS got concessions on the upfront payments by claiming it would be "doing high volume" and "be in a position to send you substantial business." This was the result of, for example, the August 8, 2017 email from Berthelette telling LG "it is my job to make sure we are not overspending" and "do the best you can for me on the upfront price and terms for signing up."

Lewis thoroughly reviewed the contract and personally signed the Master Services Agreement ("Agreement") and each addendum.

LG and Si Well, Inc. ("CMS"), entered into the Agreement on September 27, 2017. The Agreement was to last for 24 months, through September 26, 2019. CMS could terminate the agreement upon 60 days notice. However, if there was payment due for any service provided, the termination would not be effective until payment was made in full. The Agreement has eight Addenda, each of which describes a particular service LG is to provide, which addenda were selected by CMS. As to the Software as a Service ("SAAS") and Inspection Services, CMS was required to use LG exclusively for the duration of the contact. Each addendum was separately signed by Sean Faries ("Faries") for LG and by Lewis.

The Addenda are:

1. Construction Loan Manager Hosted Application (also known as "SAAS")

This is proprietary software, which, per the Agreement, CMS was to use exclusively for the term of the contract. It is intended for lenders to use to manage and service construction loans. It is designed to be highly secure due to the confidential information it contains. The Agreement obliges LG to provide ongoing technical support to CMS and to update the software as necessary. Different features are available and CMS chose the "highest" level of the SAAS.

The price, negotiated down from what was originally quoted, was $14,950 as a one-time set-up fee and $45/month for each loan, with a $3500/m minimum. The minimum is required as there are extensive set-up and training costs, as well as ongoing updating and security monitoring.

Lewis testified the "buy in was the price of doing business" and he had no idea what it was for.

2. Construction Loan Administration Service

By this addendum, LG was to provide "limited administration services pertaining to the post-closing management of construction loans originated and underwritten" by CMS, "post-closing loan management," and "advancement advice" re loan funds. Services were billed according to a "pricing matrix."

3. Appraisal Management Services

By this addendum, CMS had access to LG's "network of accepted fee appraisers." LG acted as an intermediary between CMS and the fee appraisers, for a specific fee for each appraisal order. LG paid the appraiser and billed CMS. CMS did make use of this service. LG billed CMS for the few appraisals CMS ordered.

4. Inspection Services

By this addendum, LG was to provide "construction or renovation progress reports" and "final inspection or completion of repairs" on the work funded by CMS loans. LG had a nationwide network of inspectors, who would provide these reports. These services were also billed pursuant to a pricing matrix.

As to this service, the contract required CMS to use LG exclusively. CMS was prohibited from soliciting expressions of interest in providing the service from any other person or entity. CMS breached this term of the agreement by involving a different vendor to perform this work.

5. Project Acceptance Reporting

By this addendum CMS subscribed to LG's project, plan and budget review services. These services were also billed pursuant to a pricing matrix.

6. Contractor Acceptance Reporting

By this addendum CMS subscribed to a service by which LG would analyze responses to CMS' contractor questionnaire, to determine if the contractor met CMS' risk profile. This service was also billed pursuant to a pricing matrix.

7. Construction Loan Underwriting

By this addendum, CMS subscribed to a service by which LG would prepare a report on all construction-related costs, estimated the cash required to complete the construction, and analyzed other factors that could affect the ability to complete the project per the plans. This service was also billed pursuant to a price matrix.

8. Scope of Work

By this addendum, LG would consult with CMS to create a "construction loan program" which would be in conformity with various federal loan programs. These documents were billed at a flat rate, set forth in the contract. Per the eventual Agreement, CMS was to pay for this work in installments. The deliverables described in this addendum were all produced. CMS paid $17,475 as the first installment on the Scope of Work and the SAAS, and nothing further.

Berthelette left CMS in January, 2018. He was not getting paid and was frustrated that "nothing was getting launched." He began working as an independent contractor for LG by February 27, 2018, receiving his first commission as an independent contractor on or about March 30, 2018. Shannon Faries attempted to talk to Lewis about whether LG employing Berthelette would create a conflict, but Lewis did not respond. Berthelette was not promised or paid anything by LG for work on the CMS account.

Lewis and CMS came to believe, erroneously, that the fees for each new loan would amount to $3,070 which, in addition to other fees CMS charged, made the loans infeasible. There is correspondence among CMS personnel to this effect. On May 7, 2018 Lewis claims he wrote to Eli Peltzer ("Peltzer") at LG that CMS could not make loans at these rates and "may need to get out of the contract." LG has no record of receiving what CMS now describes as a notice of rescission, and CMS cannot produce the email in native form, claiming its server had some technical problems and archived emails from that period have disappeared. Despite this alleged "rescission," on June 13, 2018, Gina George ("George"), Operations Manager for CMS, wrote Peltzer asking if LG could waive the service charge until CMS could get on its feet.

Through September, 2018, LG attempted to have CMS pay its outstanding bill. On January 17, 2019, counsel for LG wrote the matter would have to arbitrated, pursuant to the Agreement, if CMS did not pay its bill. Within five days, CMS named LG as a defendant in a lawsuit in Texas, regarding the Agreement. LG promptly brought a motion to compel arbitration which CMS did not oppose.

LG presented evidence that CMS, in 2019, but before September 26, 2019, used a competitor's construction management service to manage 13 loans, which it had contracted exclusively with LG to manage. LG was provided with no discovery regarding loans processed by CMS between September 27, 2017 and March 2019. In Faries' opinion, the competitor provided less complete services and charged more than LG would have.

LG claims damages for: the remaining installments, and late fees, on SAAS and the Scope of Work documents; unpaid appraisal fees; breach of the exclusive inspection services addendum; interest on all damages; fees and costs as the prevailing party; and damages for breach of the implied contractual term of good faith and fair dealing. The latter relates primarily to the bringing of a lawsuit, when the Agreement requires arbitration, and failing to comply with discovery requirements and rulings.

### III. ANALYSIS

#### A. Liability

LG and CMS had a detailed, comprehensive contract, whose components were selected by CMS. LG performed by creating the SAAS, specific to CMS' needs and in providing the Scope of Work documents. It began performing other services, such as contracting for appraisals, and inspections and would have continued to do so, but for CMS' repudiation of the contract

#### B. Affirmative Defenses

Although CMS did not raise affirmative defenses, by not filing a Rule 9(a) answer, in the interests of completeness, the Arbitrator will consider its defenses.

**First**, Lewis took the position that he was approached by Berthlette to enter this new field (to CMS) of construction and renovation loans. Berthelette testified that Lewis wanted to engage in this expansion and Berthelette had contacts and an understanding of the nature of the "new" business. The Respondent took the position, throughout, that Berthelette was somehow being compensated by LG to steer CMS to LG's applications. No evidence supporting this assertion was offered. Nor was there any evidence, other than Lewis' testimony, that Berthelette represented LG's platform as a "pilot" project (which it was not) and that it would place CMS in an "elite" position to be part of it. Despite the rather desperate financial situation in which Berthelette found himself, the weight of the evidence is that CMS was interested in expanding its portfolio and Berthelette provided a few options, clearly believing LG's was the best

**Second,** Lewis took the position that he reasonably relied on Berthelette's representations about the terms of the Agreement, and those representations did not accurately reflect the contract terms. There is no objective evidence that Berthelette promised there would be a "rollout" as Lewis described it, that is, time for business to ramp up before all the fees needed to be paid. In fact, Berthelette made it clear that, to achieve long term savings in personnel and infrastructure, by sub-contracting work to LG, CMS would have payments early in the contract, which it could not entirely pass on to individual borrowers (the Scope of Work documents, the SAAS build-out and the $3500/m minimum payments), until the number of construction/renovation loans built up. Investing money upfront to create a better infrastructure to realize gains over time, is not a novel concept. Berthelette, in fact, achieved savings for CMS, both by getting reduced costs and allowing them to be paid over several months.

Lewis testified at length, and his expertise was abundant and clear. He testified "he understood the construction business." He has been in the loan business for forty years, and runs a company that has existed for 35 years, manages billions of dollars in loans and has 130 employees. He was able to recount loan experiences from decades before with tremendous detail and acknowledged it was "not like me" to rely so much on Berthelette. It is not credible that he did not actually read and/or understand the Agreement, or that his own free will was somehow supplanted by Berthelette's.

**Third,** Lewis testified there was no contract actually created as there was a unilateral mistake on his part as to the true cost of the contract to CMS. However, he also testified that "we expected to have 50 construction loans a month and would allocate the fees among the 50 loans." That is, in fact, exactly the way in which the Agreement was meant to operate.

If there was a mistake, it was in CMS' mis-calculation as to how quickly the investment would be profitable, or even pay for itself. Lewis testified the parties had "different understandings about the propriety and commercial viability of the contract." This is an error in judgment about how quickly the contract would be lucrative, not a mistake about a objective fact.

7

LG did not hide or obscure its pricing system, and Lewis was capable of analyzing it. Lewis' position that CMS had a "reasonable and manifest understanding that the billing for the fees would be adjusted to allow it to ramp up and get the program off the ground" is not reflected in any correspondence leading up to the Agreement. Nothing in any communication, or in commercially objective analysis, suggests LG was taking on that risk and bearing any potential loss from CMS generating insufficient business to be able to absorb the cost for a period of time.

Both LG and CMS believed CMS would be doing substantial business and using LG's platform extensively. CMS failed to do so, and, in fact, ceased making any real efforts to do so mere months into the Agreement. This is not a mistake of fact. This is a post-contractual failure by CMS to generate the business that could have made LG's services profitable.

**Fourth,** while CMS purports to have rescinded the contract, it has proven no legal grounds for doing so. It's "rescission" document is far from clear, and there is doubt as to whether it was sent. There is little doubt that it was <u>not</u> received by LG. And, CMS' conduct following the purported rescission contradicts the notion that CMS believe the contract had terminated.

C.   **Damages**

CMS's failure to fully respond in discovery makes damages uncertain. Given what it did produce, and given the acknowledged non-payment of the SAAS and Scope of Work costs, the evidence is clear LG is entitled to $137,477.98 plus interest per the contract at 1.5% per month until entry of judgment.

LG also asks for damages for the costs it incurred, persisting in the face of CMS' failure to comply with the arbitration provision of the Agreement and failure to provide adequate discovery. Much of LG's request deals with time spent by its principals and other employees. Some of LG's requests are estimates of hours spent on executing the Agreement. These were part of the contract price, and will be recouped by the award of contractual damages. Other claimed hours were spent participating in the litigation, then the arbitration. Much of this will be included in the award of attorney's fees and costs, as the prevailing party. No additional damages are awarded for this claim.

D.   **Attorney's fees and costs**

As prevailing party, Claimant is contractually entitled to an award of reasonable attorney's fees and costs. Claimant seeks fees, not only for the arbitration conducted in California, but for having to appear defensively in litigation in Texas, on both of which it prevailed - substantively in California and procedurally in Texas.

8

California lead counsel's rate is reasonable and in keeping with her experience and qualifications, and the locale in which she practices. Associate counsels' rates are likewise proportionate and reasonable. Although various tasks may have been "blocked" together if they were done on a single day, the description of the tasks makes clear what work was done, and the time spent for each date was reasonable on its face. Fees in the amount of $65,548.51 are awarded

The legal work in Texas was required to enforce the provisions of the contract between the parties which required disputes be resolved by arbitration in California, and not in litigation in Texas. The Texas trial court apparently found diversity jurisdiction required the matter be removed to federal court and the federal court apparently found the claims were subject to arbitration, and, therefore, "on the contract." The hourly rates of both lead and associate counsel are found to be reasonable given their experience and the locale in which they practice. Fees are awarded in the amount of $23,380.

As prevailing party, LG is entitled to have its fees paid to JAMS reimbursed, in the amount of $16,550.

Although no doubt necessary to the conduct of the arbitration, the time spent by LG witnesses, who were its officers and/or employees, are not compensable, as they are neither attorney's fees nor incurred costs, but were, instead, part of the employment duties of the witnesses. This claim is comparable to a claim for loss of earning due to participating in litigation, which is not an allowable cost.

### IV. CONCLUSION

A.     LG is determined to be the prevailing party.

B.     LG is entitled to damages in the amount of $137,477.89, plus interest of 1.5% per month, from November 20, 2020 to judgment.

C.     LG is entitled to an award of attorney's fees and costs in the total amount of $105,478.51.

Dated:     September 2, 2021

_[signature]_

Hon. Melinda A. Johnson, Ret.
Arbitrator

9

**PROOF OF SERVICE BY E-Mail**

Re: Land Gorilla, LLC vs. SiWell, Inc., dba Capital Mortgage Services of Texas
Reference No. 1220061506

I, Jeff Lucas, not a party to the within action, hereby declare that on September 2, 2021, I served the attached AWARD on the parties in the within action by electronic mail at San Diego, CALIFORNIA, addressed as follows:

| | |
|---|---|
| Linda Somers Smith Esq. | Charles W. Nunley Esq. |
| Adamski Moroski Madden Cumberland & Green LLP | Malcolm Cisneros A Law Corporation |
| P.O. Box 3835 | 2112 Business Center Dr |
| San Luis Obispo, CA   93403-3835 | 2nd Floor |
| Phone: 805-543-0990 | Irvine, CA   92612 |
| lss@ammcglaw.com | Phone: 949-252-9400 |
|    Parties Represented: | Charlie@mclaw.org |
|    Land Gorilla, LLC |    Parties Represented: |
| |    SiWell, Inc., dba Capital Mortgage Services |

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Diego, CALIFORNIA on September 2, 2021.

*Jeff Lucas*
_____
Jeff Lucas
JAMS
JLucas@jamsadr.com